# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

LEE ELLEN HUFF                CIVIL ACTION NO. 19-0659

VERSUS                      JUDGE MICHAEL J. JUNEAU

U.S. COMM'R S.S.A.          MAGISTRATE JUDGE WHITEHURST

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be AFFIRMED.

## ADMINISTRATIVE PROCEEDINGS

The claimant, Lee Ellen Huff, originally filed an application for disability insurance benefits ("DIB") on August 4, 2015, alleging disability beginning on April 8, 2015 due to vertigo, migraine disorder, discoid lupus, residual effects of knee surgeries, osteoarthritis, degenerative disc disease, fibromyalgia, affective disorder, anxiety disorder, and cognitive disorder.[1]  Her application was denied, and the claimant requested a hearing, which was held on February 9, 2018 before Administrative Law Judge Carolyn Smilie.[2]  The ALJ issued a decision on September 27, 2018,[3] concluding that the claimant was not disabled within the

---

[1] Tr. 19.
[2] Tr. 64-106.
[3] Tr. 16-36.

1

meaning of the Social Security Act ("the Act"), and the Appeals Council upheld the ALJ's decision on March 28, 2019.[4]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).   The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born in 1967 and was 47 years old, a younger person under the Act, at the time of her alleged onset date of April 8, 2015.  The claimant has a Bachelor of Science degree in child and family services, and a long, consistent work history (1991 through 2015) as a Medicaid waiver case manager and support coordinator.  The claimant alleges that substantial evidence does not support the ALJ's finding that she can perform her past relevant work as what the ALJ termed a "Mental Retardation Professional," because of the combination of her impairments, her allegation that she satisfies a Listing, and the side effects of her medications.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

---

[4] Tr. 1-3.

proper legal standards were used in evaluating the evidence.[5] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[7]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[8] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[9] Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[10] Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[11]

---

[5] *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[6] *Id.* at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[7] *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[8] 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135(5th Cir. 2000).

[9] *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[10] *Martinez v. Chater*, 64 F.3d at 174.

[11] *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

## B.     Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[12]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[13]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[14]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[15]

---

[12]  See 42 U.S.C. § 423(a).
[13]  42 U.S.C. § 1382(a)(1) & (2).
[14]  42 U.S.C. § 1382c(a)(3)(A).
[15]  42 U.S.C. § 1382c(a)(3)(B).

C.    <u>**Evaluation Process and Burden of Proof**</u>

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process required the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[16]  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[17]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[18] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[19]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[20]

---

[16]  20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).
[17]  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).
[18]  20 C.F.R. § 404.1520(a)(4).
[19]  20 C.F.R. § 404.1545(a)(1).
[20]  20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps.[21]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[22]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[23]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[24]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[25]

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined that the claimant meets the insured status requirements of the Act through December 31, 2020.  The ALJ further determined, at step one, that the claimant has not engaged in substantial gainful activity since April 8, 2015, her alleged onset date.[26] This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: vertigo, headache disorder, degenerative joint disease, residual effects

---

[21] *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[22] *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[23] *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[24] *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[25] *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[26] Tr. 19.

6

of knee surgeries, discoid lupus, and obesity.[27] This finding is supported by evidence in the record. However, the ALJ determined that the following were not severe impairments: seizure disorder, degenerative disc disease, sleep-related breathing disorder, status post total abdominal hysterectomy, bilateral salpingo-oopherectomy, fibromyalgia, and several mental impairments, including affective disorder, anxiety disorder, and cognitive disorder. The claimant alleges that the failure to find her mental impairments not severe is error.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[28] The claimant also challenges this finding, arguing that she satisfies the requirements of Listing 2.07.

At step four, the ALJ found that claimant has the residual functional capacity to perform sedentary work with the following exceptions: no pushing or pulling on foot controls bilaterally; no overhead work bilaterally; occasional climbing of ramps and stairs with handrails; occasional stopping and balancing; never climbing ladders, ropes, or scaffolds; never kneeling, crouching, or crawling; no exposure to hazards such as unprotected heights, moving mechanical parts, or operating a motor vehicle; avoiding concentrated exposure to chemicals, disinfectants, and products that could

---

[27] Tr. 19.
[28] Tr. 326.

irritate the skin; no exposure to extremes of temperature or vibration; no more noise than would be found in a standard retail or office environment; and no walking on uneven surfaces.   Therefore, the ALJ found that the claimant is capable of performing past relevant work as a Mental Retardation Professional, and is, therefore, not disabled or entitled to benefits.[29]

## E.    THE ALLEGATIONS OF ERROR

The claimant alleges that the ALJ erred as follows:

- erred at Step 2 in finding that the claimant's mental impairments are non-severe;

- erred in evaluating the medical opinion evidence, specifically the opinion of the psychological consultative evaluator Amy Cavanaugh, Ph.D.;

- erred at step three in finding that her vertigo did not meet the requirements of Listing 2.07 (disturbance of labyrinthine-vestibular function);

- erred in evaluating the medical opinions of Ms. Huff's treating neurologist, Steven Snatic, M.D.; and

- erred in failing to consider the side effects of her medications in evaluating her RFC.

The undersigned will address each of the claimant's assignments of error in turn.

---

[29] Tr. 35.

8

## Mental Impairments

The ALJ determined that the claimant's affective disorder, anxiety disorder, and cognitive disorder, "while medically determinable, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe."[30]  In making this decision, the ALJ explained:

> . . . [t]he undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments [citation omitted].  These four areas of mental functioning are known as the paragraph B criteria. The four areas of mental functioning are: understand, remember or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.

> . . . the claimant has the following degree of limitation in the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20, CFR, Part 404, Subpart P, Appendix 1: mild limitations in understanding, remembering or applying information; mild limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and mild interaction in adapting or managing oneself.[31]

The severity of "mental disorders" is measured using medical criteria ("paragraph A"),[32] functional criteria ("paragraph B"),[33] and an analysis of "serious and persistent mental disorders" ("paragraph C").[34]  A claimant's mental disorder

---

[30] Tr. 21.

[31] *Id.*

[32] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(a).

[33] *Id.* at § 12.00(A)(2)(b).

[34] *Id.* at § 12.00(A)(2)(c).

satisfies "paragraph B" when it results in one "extreme" or two "marked" limitations in the following "areas of mental functioning ... in a work setting:" (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; (4) and adapting or managing oneself.[35] A "marked limitation" means that a claimant is seriously limited in her ability to independently, appropriately, and effectively function in the area at issue.[36] An "extreme limitation" means that a claimant has no ability to so function on a sustained basis.[37] *Vigil v. Berryhill*, 2018 WL 3233345, at *2 (W.D. Tex. July 2, 2018).

In *Vigil*, the court noted that the claimant's anxiety and depression disorders would qualify if they satisfied the requirements of both Paragraphs A and B, or A and C.  2018 WL 3233345 at *2.  Here, it is unclear to the Court whether the ALJ analyzed the claimant's mental impairments under Paragraph A, as only the Paragraph B criteria are listed and discussed.  For this reason, the undersigned will assume for the purposes of this report that the ALJ found in the claimant's favor with respect to the Paragraph A criteria.  Therefore, the Court must determine whether substantial evidence in the record supports the ALJ's finding that the claimant does not satisfy the Paragraph B criteria for mental impairments.

---

[35] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b).
[36] *Id.* at § 12.00(F)(2)(d).
[37] *Id.* at § 12.00(F)(2)(e).

In this case, the ALJ found that the claimant in this matter has only mild limitations in all four areas of the analysis of the Paragraph B criteria for mental impairments.  As an initial matter, the ALJ noted that the claimant was able to participate at her hearing without any observed difficulty; was able to answer questions about her medical and employment history in a clear, coherent, and cooperative manner; and was observed to have no difficulties with understanding, maintaining her attention, or cooperating at the hearing.[38]  With respect to the medical evidence, the ALJ noted that the record is devoid of mental health treatment records, but there is some evidence of mental status findings that appear in the record sporadically.  The ALJ noted that the majority of the treatment records, dated from 2008 to 2018, show that the claimant was alert, fully oriented, appropriate and/or pleasant and had a normal mood, normal affect, normal speech, normal memory, intact attention and concentration, and no noted abnormal mental status findings.[39]

Chief among the claimant's complaints is the "limited weight" given to the medical opinion of Dr. Amy Cavanaugh, who conducted a psychological consultative examination of the claimant on March 15, 2016.  Dr. Cavanaugh, a clinical and medical psychologist, noted that although the claimant reported "terrible" mood and short-term memory problems, her behavior was within normal

---

[38] Tr. 22.
[39] *Id.*

limits and her judgment and insight were good.  Dr. Cavanaugh noted that the

claimant was alert, aware of her surroundings, able to sign and date DDS paperwork

without assistance, and appeared to adequately comprehend instructions.  The

claimant had concrete levels of abstract reasoning with some evidence of higher

abstract thinking.  She did not appear distressed during the interview, although she

was anxious and tearful.  She displayed adequate attention and concentration and

fair persistence.  She was cooperative and sociable and demonstrated basic social

skills by engaging in appropriate eye contact and reciprocal conversation.[40]

Dr. Cavanaugh opined as follows:

> It is recommended that the claimant seek psychiatric treatment from a
> mental health professional regarding her mood and anxiety symptoms
> in order to develop a treatment plan that better suits her needs.  It is also
> recommended that the claimant seek counseling services, specifically
> to cope with her medical conditions, mood, and anxiety surrounding her
> somatic sensations.  Continued treatment could allow the claimant to
> function more independently in the future.  Findings indicate that the
> claimant has the capacity to understand and follow fairly complex
> instructions.  Her ability to retain information is reportedly impaired,
> though she was able to provide many facts and details about herself
> provided she put forth effort.  Performance on the memory task of the
> mental status evaluation was inadequate.  Her ability to sustain
> concentration to perform complex tasks appears within normal limits.
> Her ability to relate to others, including supervisors and co-workers is
> good.  Her ability to tolerate the stress and pressure associated with day-
> to-day work activity and demands is currently borderline impaired but
> is expected to be adequate with adequate symptoms relief.  Her ability
> to sustain effort and persist at a normal pace over the course of a 40-
> hour workweek does appear to be borderline impaired from a mental

---

[40] Tr. 475-479.

perspective.  She appears capable of managing her financial affairs with the help of her partner.[41]

Dr. Cavanaugh also appears to have given the claimant a GAF score of 45. The claimant argues that this score is indicative of disabling mental impairments.

The GAF "is a 100–point scale used to report the clinician's judgment of the individual's overall level of psychological, social and occupational functioning." *Locure v. Colvin*, 2015 WL 1505903, at *8 n.5 (E.D. La. Apr. 1, 2015).  "A GAF score of 41 to 50 is classified as reflecting serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Boyd*, 239 F.3d at 702 (quotation marks and footnote omitted).  However, it is well-settled that a claimant's GAF scores "are not determiners of an ability or inability to work." *McMurray v. Colvin*, 2017 WL 978706, at *4 (S.D. Tex. Mar. 14, 2017) (citations omitted).  As the court noted in *Lopez v. Saul*, 2020 WL 5233006 at *5 (S. D. Tex. Sept. 2, 2020):

> The Commissioner does not endorse the use of GAF scores to determine disability, and federal courts have likewise declined to find a strong correlation between a claimant's GAF score and the ability to work. *See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (explaining that a claimant's GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"); *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015) ("[F]ederal courts have declined to find

---

[41]  Tr. 478-79.

such a strong correlation between an individual's GAF score and the ability or inability to work."). In fact, in the updated version of the Diagnostic and Statistical Manual of Mental Disorders, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to its "conceptual lack of clarity and questionable psychometrics in routine practice." *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quotation marks, citation, and ellipsis omitted). While the "GAF scale is intended for use by practitioners in making treatment decisions[,] ... GAF scores have a limited significance in a disability controversy because they do not necessarily relate to whether a claimant is disabled under the Act and may indicate problems that do not necessarily relate to an ability to hold a job." *Harris-Nutall v. Colvin*, No. 3:15-CV-3334-D, 2016 WL 3906083, at *5 (N.D. Tex. July 19, 2016). Nonetheless, "[a]lthough a GAF score does not determine disability, the ALJ is required to review the scores as part of the evidence of record and, based on the entire record, make a disability determination on a case-by-case basis." *Hanner v. Saul*, No. 4:19-CV-02032, 2020 WL 4043637, at *4 (S.D. Tex. June 26, 2020).

Here, the ALJ specifically addressed the claimant's GAF score and gave it "limited weight" given the broad areas of normal findings in Dr. Cavanaugh's report, finding that the claimant's GAF score was not fully indicative of the claimant's conditions noted in Dr. Cavanaugh's report. Overall, the ALJ gave "some weight" to Dr. Cavanaugh's opinions, noting that Dr. Cavanaugh failed to set forth a specific opinion in terms of the claimant's ability to retain information, based in part, on an inadequate effort during memory testing. The ALJ appears to have focused on Dr. Cavanaugh's actual examination, which revealed that the claimant was alert, aware, cooperative, and sociable, and had normal behavior, comprehensible speech,

14

appropriate eye contact, a linear thought process, appropriate thought content, good insight, and good judgment.

The claimant specifically argues that although Dr. Cavanaugh reported that the claimant's ability to work a 40-hour workweek appears to be "borderline impaired," the ALJ, in fact, noted that Dr. Cavanaugh reported that the claimant can work a 40-hour workweek. The ALJ's particular finding that the claimant can work a 40-hour workweek does appear to misstate Dr. Cavanaugh's opinion on this point. Dr. Cavanaugh, in fact, reported that the claimant's ability to work a 40-hour workweek is "borderline impaired." However, after a review of the entire record, the undersigned concludes that the ALJ's determination that Dr. Cavanaugh's opinion is only entitled to "some weight" is based on more than just this one finding in the doctor's report. The ALJ appears to have focused more heavily on Dr. Cavanaugh's actual examination and findings, noting that there were inconsistencies between the claimant's self-reports and her performances on examination when the claimant put forth effort. The ALJ also noted that the claimant's ability to sustain concentration to perform complex tasks was within normal limits, and her ability to relate to others, including supervisors and co-workers, was good. These findings are relevant to the disability mental health evaluation.

The record shows that the ALJ properly considered the contradictions between the claimant's self-reports and her examination performance. *See, e.g.,*

*Zimmerman v. Astrue*, 288 F. App'x 931, 936–37 (5th Cir. 2008) (where doctor diagnosed claimant with depression and antisocial personality disorder and assigned him a low GAF, ALJ noted doctor's diagnoses and GAF score were inconsistent with doctor's mild description of claimant's impairments, and concluded the ALJ's conclusion was supported both by that doctor's description of Zimmerman, as well as by the testimony of a non-examining medical expert, who testified the claimant was "reasonably well stabilized" by his medication, did not have major depression, and had only mild restrictions on daily living, social functioning, and concentration due to his depression, and also opined that the claimant had no limitations in his ability to understand and carry out short, simple instructions). Here, the ALJ noted the doctor's report of a borderline-impaired ability to retain information, tolerate stress and work demand pressures, and to sustain effort and persist in a 40-hour workweek, but found the opinion was not specific and was vague, based in part on the claimant's "inadequate effort" on testing.[42]

Additional evidence supports the ALJ's mental health determination, including the report of Dr. William G. Irr, a neuropsychologist, who treated the claimant from October 6, 2015 through December 16, 2015 due to complaints of cognitive decline, memory loss, variable attention, poor decision-making, reduced processing speed, and visuospatial problems. Dr. Irr reported that the claimant

---

[42] Tr. 34.

arrived promptly, was appropriately dressed and groomed, ambulated without assistance, and her speech was within normal limits.  When asked about her mood, the claimant stated that she was depressed and Dr. Irr reported that her effect was dysthmic.  She reported that she had a migraine on the date of her examination.  Formal measures of effort, however, revealed variable test engagement.[43]  The claimant's performance on the first task was within expectations, but her performance on the second task was interpreted cautiously and her performances on all subsequent trials was either borderline or below expectations, which was concerning for variable effort.[44]   On an embedded measure of effort, her performance was again borderline.  Dr. Irr therefore reported that the results of her evaluation were interpreted with caution.  Dr. Irr reported:

> Current neuropsychological testing revealed that Ms. Huff's performances on formal measures of effort were inconsistent and reflective of variable test engagement.  Validity scales on self-report questionnaires revealed signs of over-reporting of somatic complaints.  As such, it was possible that the variability and impairments found on testing may be an underrepresentation of her true level of functioning.
>
> Across this evaluation, Ms. Huff exhibited deficits on measures of verbal fluency, simple attention (i.e. digits forward), fine motor dexterity, and rote verbal memory (i.e. acquisition & recall).  Of note, she was able to retain an adequate amount of the rote verbal information that she previously learned.  Variability was noted on measures of processing speed and speed executive functioning.  Her accuracy on executive functioning tasks was intact.  Her performances across the remainder of the evaluation were within expectations.  On formal

---

[43] Tr. 432.

[44] *Id.*

measures of mood, Ms. Huff reported mild depression and moderate anxiety, as well as somatic complaints for which there was a probable psychological component.[45]

After a review of the record, the undersigned concludes that the ALJ properly considered all of the medical evidence in the record concerning the claimant's mental impairments, including the reports of several examining physicians. After a review of the ALJ's finding and consideration of the medical reports, the undersigned concludes that substantial evidence supports the ALJ's determination that the claimant does not have disabling mental impairments.

### Listing 2.07 and the opinion of Dr. Rojas

At the third step of the sequential evaluation, the ALJ determines whether the medical evidence meets or equals the criteria of a listed impairment in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(d). The Listing of Impairments in Appendix 1 describes conditions and impairments that are sufficiently severe to prevent an individual from engaging in any gainful activity, not just "substantial gainful activity," regardless of age, education or work experience. 20 C.F.R. § 404.1525(a); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Thus, a claimant is automatically entitled to benefits if her impairment meets or equals the criteria of one of the listed impairments in Appendix 1 to Subpart P of Part 404. 20 C.F.R. §404.1520(d). Because the Listings were designed to operate as a presumption of

---

[45] Tr. 434.

disability that makes further inquiry unnecessary, the medical criteria of the Listings are more restrictive than the statutory disability standard. *Zebley*, 493 U.S. at 532.

The burden of proof rests with claimant to provide and identify medical signs and laboratory findings that support all criteria of a listed impairment. *Zebley*, 493 U.S. at 530; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). The listings criteria are "demanding and stringent." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). A mere diagnosis of a condition will not suffice. "For a claimant to show that his impairment matches a listing, it must meet all of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530. The claimant has the burden to establish that her impairment met or equaled an impairment enumerated in the Listings; it is not the Commissioner's burden to prove that Plaintiff did not satisfy a Listing. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); 20 C.F.R. § 404.1520(a)(4)(iii).

Listing 2.07 provides:

2.07 Disturbance of labyrinthine-vestibular function (Including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing with both (A) and (B):

    A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and

    B. Hearing loss established by audiometry.

20 CFR Pt. 404. Subpt. P App. 1 §2.07.

The ALJ determined that the claimant did not meet the listing for vertigo and in reaching this conclusion, relied on the results of her videonystagmography (VNG) test dated November 2016.[46]  The claimant and the Commissioner interpret the results of this test differently.  The claimant focuses on that portion of the test report which states that the claimant's "fixation suppression was abnormal for all 4 calorics," and that she has "central vestibular abnormality."[47]  The Commissioner relies upon those portions of the report which state the following:

Physical exam:

Constitutional: She is oriented to person, place, and time.  She appears well-developed and well-nourished.  No distress.
HENT:

Head: Normocephalic and altraumatic.
Right Ear: Hearing, tympanic membrane, external ear and ear canal normal.  Tympanic membrane is not retracted.  No middle ear effusion.  No decreased hearing is noted.
Left Ear: hearing, tympanic membrane, external ear and ear canal normal.  Tympanic membrane is not retracted.  No middle ear effusion.  No decreased hearing is noted.
[ . . . ]
Neurological: She is alert and oriented to person, place, and time.  No cranial nerve deficit.
Psychiatric: She has a normal mood and effect.
[ . . . ]
**VNG reviewed, normal.**[48]

---

[46]  Tr. 797-98; 803.
[47]  Tr. 798.
[48]  Tr. 803 (emphasis added).

The claimant argues that the ALJ did not consider all of the relevant evidence and relied upon the portion of the report that noted the testing was "normal," while ignoring the portions to the report which indicate an abnormal "fixation suppression" and a central vestibular abnormality.  However, the claimant does not argue how the VNG's notations as to "fixation suppression" and "central vestibular abnormality" undercut the final determination of the report that the VNG was "normal."  Indeed, the ALJ is free to review all of the evidence in the record, including all portions of the report, as well as the reports from other doctors and experts, and the claimant's own admissions.  Here, the ALJ concluded that all of the findings within the report support a finding that the claimant's VNG report was, essentially, normal.  The ALJ further considered that, since the alleged onset date, the claimant has not demonstrated "progressive hearing loss."  The ALJ additionally noted that the record contains a lack of evidence of a history of frequent attacks of balance disturbance at the level of severity contemplated by the Listings.[49]

The claimant also argues that an April 2016 "To Whom it May Concern" letter from her treating neurologist, Dr. Sylvia Rojas, supports her argument that she satisfies Listing 2.07.  In this letter, Dr. Rojas reports that the claimant is "disabled 100%," and reports that she has been treated for vertigo, nausea, and life-limiting

---

[49] Tr. 24-25.

migraines.[50]  The ALJ considered Dr. Rojas' reports and noted that she was a treating provider and a specialist, but gave these reports no weight, finding that the doctor's opinions consisted of conclusory statements without citation to objective findings and were devoid of functional limitations.[51]  The ALJ acknowledged Dr. Rojas's recommendations limiting the claimant to no driving, crouching, and crawling as "generally consistent with the record."[52]  The ALJ also referenced the report of Dr. David Foreman, a treating physician, who found that the claimant was unable to drive due to nystagmus.[53]  However, the ALJ assessed an RFC for sedentary work that did not require operating a motor vehicle, crouching, or crawling,[54] and the vocational expert testified at the claimant's hearing that there is past relevant work the claimant can perform despite not being able to drive.[55]  In discounting portions of Dr. Rojas's reports, the ALJ pointed out the claimant's November 2016 normal VNG report.

The ALJ also considered the December 2017 opinion of the claimant's treating neurologist, Steven Snatic, who reported that the claimant had balance problems and was a bit "dangerous" walking without her cane.[56] The ALJ addressed

---

[50] Tr. 766.
[51] Tr. 32.
[52] Id.
[53] Tr. at 818.
[54] Tr. 25-26.
[55] Tr. 94-96.
[56] Tr. 1100.

Dr. Snatic's reports in detail, noting that Dr. Snatic was a treating neurologist, and thus a treating provider and a specialist.  Nevertheless, the ALJ gave the opinion of Dr. Snatic limited weight, finding that the record was not consistent with his finding that the claimant required a cane or that a cane was medically necessary.[57]  The ALJ discussed the other numerous reports in the record which reflect that the claimant does not need an assistive device, but instead showed normal 5/5 strength, intact sensation, and no noted motor, strength, sensor, arm/hand use, or gait deficit or abnormality.[58]  The ALJ also considered the reports of Khahn Ho, M.D., dated June 2016 to December 2017, that did not note the use of an assistive device or any gait deficit or abnormality.[59]

The ALJ also considered and gave weight to the more recent findings of another treating specialist, Dr. Moises Arriaga, who reported in May 2018 that the claimant was "able to ambulate without assistance, making a [computerized posturography score of 13] and her gait discordant."[60]

The claimant has the burden to establish that her impairment met or equaled an impairment enumerated in the Listings; it is not the Commissioner's burden to prove that plaintiff did not satisfy a Listing.  *See Muse v. Sullivan*, 925 F.2d 785, 789

---

[57] Tr. 1100-02.
[58] Tr. 28-29, 32, *citing* 422, 425, 428, 764, 768, 770, 771, 774, 779, 1100-02.
[59] Tr. 29, *citing* 519, 535, 545, 980, 981, 990, 998, 1006, 1110, 1118, 1128.
[60] Tr. 32-33, *citing* 1163.

(5th Cir. 1991); 20 C.F.R. § 404.1520(a)(4)(iii). Additionally, for a claimant to show that her impairment matches a listing, she must meet all of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Zebley*, 493 U.S. at 530. In light of this standard, and considering the entirety of the record, the undersigned concludes that the ALJ properly considered all of the medical opinion evidence, and relied more on the findings of Dr. Arriaga, a treating specialist, that were consistent with the rest of the evidence, rather than Dr. Snatic's anomalous opinion. After review of this evidence, the undersigned concludes that the ALJ's conclusion that the claimant does not satisfy Listing 2.07 is supported by substantial evidence in the record. Therefore, this argument has no merit.

### 4.   Side effects of medication

Finally, the claimant argues that the ALJ erred in failing to consider the side effects of her medication in evaluating her RFC. However, other than the inclusion of the foregoing in the "Statements of Errors" section of her appellate brief, and a one-line reference in her brief that "the medications she takes for seizure prevention . . . make her sleepy," there is no additional argument or supporting medical documentation in the brief or the record supporting an argument that the claimant's side effects from her medication are disabling. Additionally, at her administrative hearing, the claimant's attorney was allowed to question the VE and offer additional

limitations to her RFC assessment. Despite offering additional limitations that were not suggested by the ALJ, the claimant's attorney included no limitations caused by the side effects of medication. Therefore, the ALJ did not include such limitations in her RFC assessment.

In *Wagner v. Astrue*, 2010 WL 546739, at *9 (E.D. La. Feb. 12, 2010), the district court explained:

> In Dr. Mandich, whose medical report is the most thorough of those that were admitted in the proceedings below, found no objective support for plaintiff's complaints of back pain or an inability to stand for long periods of time. Aside from the single, fleeting reference to a possible medication side-effect or complication on March 7, 2007, the record offers no objective support for any medication-related limitations. On the contrary, in two separate Disability Reports that appear in the record, no side effects from plaintiff's various medications were identified, including any that may have been caused by Indapamide or potassium chloride. (Tr. pp. 76, 97). Absent some complaint, presumably to the prescribing physician, the Court is directed to no authority which obligates an ALJ to explore every possible, as opposed to actual, side effect that a claimant's medications may cause.

Considering that the claimant's argument that the side effects of her medication are disabling is unsupported by medical evidence in the record, and that the claimant herself failed to include medication limitations in her RFC at her administrative hearing, the undersigned concludes that the absence of such a discussion in the ALJ's ruling is not error, and there is substantial evidence supporting the ALJ's RFC assessment in this matter.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned finds that the ALJ applied appropriate legal standards in ruling on this case, and the ALJ's findings are based on substantial evidence in the record.  Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **AFFIRMED** and this matter dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

THUS DONE in Chambers on this 1st day of December, 2020.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE